1   BROWNE WOODS GEORGE LLP
    Eric M. George (No. 166403)
2   Gene F. Williams (No. 211390)
    2121 Avenue of the Stars, 24th Floor
3   Los Angeles, CA 90067
    Telephone: 310.274.7100
4   Facsimile: 310.275.5697
    Email: egeorge@bwgfirm.com
5          gwilliams@bwgfirm.com

6   Attorneys for Defendants
    Sonja Productions LLC,
7   Sonja Tremont-Morgan, and Counter-Claimant
    Sonja Productions LLC
8

9

10                  UNITED STATES DISTRICT COURT

11       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

12

13  HANNIBAL PICTURES, INC., a          CASE NO. CV06-1814 GHK (VBKx)
    California corporation,             Assigned for all Purposes to Judge
14                                      George H. King
                Plaintiff,
15                                      [Removed from the Superior Court for
        vs.                             the County of Los Angeles, Case No.
16                                      BC348012]
    SONJA PRODUCTIONS LLC, a
17  Delaware limited liability company; **DEFENDANTS' MEMORANDUM**
    SONJA TREMONT-MORGAN, an            **OF CONTENTIONS OF FACT AND**
18  individual; and DOES 1 through 10,  **LAW**
    inclusive;,
19                                      Trial:    May 19, 2009
                Defendant.
20
    ─────────────────────────────
21  AND RELATED CROSS-ACTION

22

23

24

25

26

27

28

228233_1.DOC

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

## I.    INTRODUCTION

Sonja Morgan ("Morgan") created Sonja Productions, LLC ("SP") in 2005 to act as a traditional production company, packaging film scripts and talent to raise funds to finance those films.  With that plan in mind, SP entered into an informal deal memorandum (the "Contract") with Hannibal Pictures, Inc. ("Hannibal") to finance and produce the film Fash Flash to Bang Time ("Fash Flash").  Central to SP's ability to package the film and raise funds to finance the film was the ability to obtain written confirmation that high profile star John Travolta, would play the male lead.  SP intended to package the script and Mr. Travolta as the lead to pitch the film to third party investors and banks to raise the funds necessary to finance the film.

In this action, Hannibal alleges SP breached the Contract by failing to provide funding for the film.  Hannibal also alleges fraud, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, and unfair business practices, all allegedly arising out of SP's purported failure to perform under the terms of the contract.

SP did not breach the contract, however, because the critical condition precedent to SP's performance under the production contract, written confirmation that John Travolta would play the male lead in Fast Flash, never occurred. Likewise, SP did not breach the implied covenant of good faith and fair dealing because SP fully intended to comply with the contract had the condition precedent been fulfilled.  SP did not commit fraud or engage in negligent misrepresentations or unfair business practices because it did not make misrepresentations to Hannibal and had no intent to defraud Hannibal.  In addition, there is no liability because Hannibal engaged in unethical and improper conduct that bars it from recovery under the principal of unclean hands.

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

## II.     FACTUAL CONTENTIONS

### A.     Defendants' Theory of the Case.

Defendants Morgan and SP (collectively "Defendants") have not engaged in any wrongdoing.  Defendants were excused from performance under the Contract based on the failure of the condition precedent to SP's performance, *written confirmation that John Travolta would play the male lead in Fast Flash.* Defendants believe that at trial the evidence will establish that:

- SP was founded by Sonja Morgan, who also provided the initial funding for SP.
- SP was founded with the intention of acting as a traditional production company, packaging motion picture screenplays and talent to raise funds from third party investors and banks to finance the films.
- SP intended to package a slate of five films and raise between $25 million and $50 million to finance and produce those films.
- SP never intended to provide the funding for the slate of films from its own finances, and never represented to Hannibal that it had the finances to fund the films without outside investors.
- SP's budget and bank statements never reflected that SP had $25 million to $50 million to internally finance films.
- John Adams Morgan never financed SP, and SP never represented that John Adams Morgan was or would provide the financing for SP.
- SP hired Silvio Sardi ("Sardi") to act as managing director.  In that role, Sardi was responsible for raising no less than 70% of the funds for the slate of five films from outside investors.
- SP entered into the Contract with Hannibal with the expectation that if and when written confirmation was provided that John Travolta would play the male lead in Fast Flash, SP would have a reasonable period of

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

time to use Travolta's connection to the film to raise the funds necessary to finance and produce the film.

- SP never received written confirmation that John Travolta would play the male lead.

- John Travolta demanded, as part of his "pay or play" agreement, that his salary of $6 million be placed in an escrow account at the time of his signing the "pay or play," a demand that SP could not meet because it needed to have Travolta attached to the film to raise the funds for the film.

- In an effort to convince Travolta to sign the "pay or play," Hannibal pressured Morgan to provide falsified bank statements (specifically to provide statements from Morgan's husband with his name whited out).

- Hannibal also attempted to commit SP to finance and produce a second film, Chasing the Dragon, despite the fact that SP expressly stated that it had no interest in financing that film.

- In its attempt to force SP to finance and produce Chasing the Dragon, Hannibal misrepresented that SP had agreed to finance and produce the film.

- Hannibal also intended to use the falsified bank statements that it encouraged Morgan to provide to "cross-collateralize" Chasing the Dragon.

- SP sent a check to Hannibal in the amount of $52,094.00 to reimburse Hannibal for expenses it had incurred, in compliance with the terms of the amendment to the Contract (with an understanding that the expenses would be returned to SP if no written confirmation was obtained).

- Once Morgan learned of Hannibal's unethical conduct, SP formally terminated the Contract and placed a stop-payment on the check to

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

1    Hannibal.

2    **B.     What Defendants Expect to Prove.**

3        **1.     <u>Background To the Dispute.</u>**

4        Sonja Morgan, who has a degree in marketing and a background as a deal

5    broker, founded Sonja Productions, LLC in 2005 with the intention of applying her

6    skills at putting deals together to the motion picture industry.  The plan for SP was

7    to package scripts and talent and use those packages to raise funds from outside

8    sources to finance the films.  Because of her inexperience in the movie industry,

9    Morgan hired Silvio Sardi, who had extensive experience in the motion picture

10   industry, to act as Managing Director.  In that role, Sardi was responsible for

11   raising no less than 70% of money for the budgets of the films that SP intended to

12   produce.

13       With this business model in mind, entered into the Contract with Hannibal to

14   produce and finance Fast Flash.  The Contract called for SP to bankroll 100% of the

15   cash flow financing for the film.  The precondition for SP providing this financing,

16   however, was written confirmation that John Travolta would play the male lead.

17   The reason for this precondition was simple:  with John Travolta formally attached

18   to the film, it would be much easier for SP to attract outside investors, since a film

19   was more likely to be successful, and profitable, with a high profile star attached as

20   the lead.  SP understood that it would be given a reasonable period of time *after*

21   Travolta was attached as the male lead to raise the funds to pay Travolta's salary

22   and otherwise finance the film.

23       Unfortunately, written confirmation was never provided.  Travolta insisted as

24   a term of his "pay or play" that his salary of $6 million be placed in escrow at the

25   time of signing the "pay or play."  This demand was impossible to meet, as SP

26   needed to have Travolta attached to raise the funds to pay Travolta's salary and

27   finance the film.

28

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

1    Hannibal, as well as attorney Don Barton, who represented both SP and

2    Hannibal in connection with the Contract, pressured Sonja Morgan to provide

3    falsified bank statements – bank statements from her husband with his name whited

4    out so that the statements would appear to be those of SP – to Travolta's

5    representatives as evidence that SP had the funds available to pay Travolta.

6        Not wanting the deal to fall through, Sonja Morgan initially contemplated

7    providing the information requested by Hannibal and Barton.  However, once she

8    came to her senses she refused to provide the information.  In addition, Hannibal's

9    suggestion that she engage in this unethical conduct, as well as Hannibal's

10   misrepresentations regarding SP's purported interest in financing Chasing the

11   Dragon, led Morgan to realize that she did not trust Hannibal, and was no longer

12   interested in doing business with Hannibal.  As a result, she canceled an expense

13   reimbursement check that had been sent to Hannibal and terminated the Contract.

14       **2.    Failure of Condition Precedent.**

15       In a breach of contract action, "where defendant's duty to perform under the

16   contract is conditioned on the happening of some event, the plaintiff must prove the

17   event transpired." *Consolidated World Investments, Inc. v. Lido Preferred Ltd.*

18   9 Cal.App.4th 373, 380 (1992); *Cochran v. Ellsworth*, 126 Cal.App.2d 429, 440-

19   441 (1954).

20       In this case, performance by SP was expressly conditioned upon ***written***

21   ***confirmation*** that John Travolta would play the male lead in Fast Flash.  This

22   condition precedent was central to the Contract, because SP needed the written

23   confirmation that Travolta would play the male lead to package the film and raise

24   the funds to finance the film from outside sources.  ***SP could not perform its***

25   ***obligations under the Contract until it received written confirmation that Travolta***

26   ***would play the male lead.***

27       The condition precedent, however, never occurred.  While Travolta

28

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

expressed interest in playing the male lead, he never provided written confirmation to SP, nor did any representative of Travolta provide such written confirmation to SP. In fact, Travolta was only willing to agree to play the male lead if SP and Hannibal agreed to place his $6 million salary in escrow upon Travolta's signing of a "pay or play" agreement that would have constituted written confirmation. SP could not comply with Travolta's demand, however, because it needed SP's written confirmation before it could raise the necessary funds.

### 3. No Breach of Implied Covenant of Good Faith and Fair Dealing.

In order to establish a claim for breach of the implied covenant of good faith and fair dealing, Hannibal must establish that SP performed a ***conscious and deliberate act*** that unfairly frustrated the agreed common purpose of the contract and disappointed the reasonable expectations of Hannibal. *See Celador Int'l Ltd. v. Walt Disney Co.*, 347 F.Supp.2d 846, 852 (C.D. Cal. 2004).

SP did not perform any conscious or deliberate act that frustrated the purpose of the Contract. SP intended to fully perform its duties under the Contract, but its performance was precluded by the failure to obtain written confirmation that John Travolta would play the male lead. SP's duties under the Contract, to provide cash flow financing and equity funds for the film, were predicated on the ability to package and market the film to third party investors as a potentially lucrative endeavor based on John Travolta's involvement. Without confirmation of Travolta's involvement, SP could not raise the funds necessary to meet its duties under the Contract.

### 4. No Fraud By Defendants.

In order to establish fraud, Hannibal must prove the following: (1) a false representation or concealment of material fact susceptible of knowledge, (2) made with knowledge of its falsity or without sufficient knowledge on the subject to

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

1  warrant a representation, (3) with the intent to induce the person to whom it is made

2  to act upon it; and such person must (4) act in reliance upon the representation (5)

3  to his damage.  *See South Tahoe Gas Co. v. Hoffman Land Improv. Co.*, 25

4  Cal.App.3d 750, 765 (1972).

5  **a)**    **No False Representations of Material Fact.**

6  Defendants made no false representations of material fact.  Defendants

7  accurately represented that SP intended to provide cash flow financing and equity

8  financing for Fast Flash.  SP made those representations based on the understanding

9  and expectation that SP would be given the opportunity, ***after receiving written***

10  ***confirmation that John Travolta would play the male lead***, to package the script

11  and Travolta's name to sell the project to outside investors to raise the funds to

12  provide cash flow financing and equity funds for the project.  The failure to obtain

13  written confirmation that Travolta would play the male lead frustrated SP's ability

14  to raise the funds necessary to meet its commitments under the Contract.  But for

15  the inability to obtain written confirmation that Travolta would play the male lead,

16  SP would have met its commitments under the Contract.

17  Defendants never represented that SP had the necessary funds to meet John

18  Travolta's demand of placing $6 million in escrow upon signing of his "pay or

19  play."  Defendants rejected Hannibal's suggestion that they falsify John Morgan's

20  bank records to make them appear to be the bank records of SP.

21  Defendants accurately represented that they would reimburse Hannibal for its

22  prior expenses, and that they would pay Hannibal the fees set forth in the Contract

23  and amendment.  It was not until Defendants became aware of Hannibal's unethical

24  conduct that Defendants stopped payment on the expense reimbursement check to

25  Hannibal and terminated the Contract.

26  **b)**    **No Intent to Induce Reliance.**

27  Any representations made by Defendants regarding their ability to provide

28

228233_1.DOC

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

1   proof of funds (Defendants deny that any misrepresentations on this matter were

2   made) were not intended to induce reliance by Hannibal.  The Contract had already

3   been signed, and both SP and Hannibal were eager to secure a "pay or play"

4   agreement from John Travolta.  In its eagerness/desperation to secure the "pay or

5   play," Hannibal pressured and harassed Sonja Morgan, and suggested that

6   Defendants falsify John Morgan's bank records to make them appear to be SP's

7   bank records so that John Travolta would believe that SP had already raised the

8   funds to pay his salary.  While Sonja Morgan briefly considered complying with

9   this unethical suggestion (because she knew the importance of obtaining a "pay or

10  play" from Travolta), she ultimately rejected the idea, and terminated the Contract

11  based on Hannibal's unethical conduct.  Hannibal took no actions in reliance on any

12  representations Defendants made regarding SP's ability to provide proof of funds,

13  and suffered no damage as the result of any such representations.

14          **5.      No Negligent Misrepresentations.**

15          In order to establish a claim for negligent misrepresentation, Hannibal must

16  establish the following: (1) misrepresentation of a past existing material fact, (2)

17  without reasonable grounds for believing it to be true, (3) with intent to induce

18  another's reliance on the misrepresentation, (4) ignorance of the truth and

19  justifiable reliance on the misrepresentation by the party to whom it was directed,

20  and (5) resulting damage.  *Lincoln Alameda Creek v. Cooper Industries, Inc.*, 829

21  F.Supp. 325, 330 (N.D. Cal. 1992).

22          As noted above, Defendants have made no misrepresentations of material

23  fact that would give rise to a claim for negligent misrepresentation.

24          **6.      No Unfair Business Practices.**

25          Hannibal's unfair business practices claims arise entirely from the allegations

26  that Defendants made false and misleading representations.  As noted above,

27  Defendants made no such misrepresentations.

28

228233_1.DOC                              - 8 -

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

C.     **Hannibal's Unclean Hands Bar Recovery.**

The defense of unclean hands arises from the maxim, " 'He who comes into Equity must come with clean hands.'" *Blain v. Doctor's Co.*, 222 Cal.App.3d 1048, 1059, (1990). "The doctrine demands that a plaintiff act fairly in the matter for which he seeks a remedy. He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim." *Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal.App.4th 970, 978 (1999); *Precision Co. v. Automotive Co.*, 324 U.S. 806, 814-815 (1945) 65 S.Ct. 993; *Hall v. Wright*, 240 F.2d 787, 794-795 (9th Cir.1957). The defense is available in legal as well as equitable actions. *Fireboard Paper Products Corp. v. East Bay Union of Machinists,* 227 Cal.App.2d 675, 728 (1964); *Burton v. Sosinsky*, 203 Cal.App.3d 562, 574 (1988). Any conduct that violates conscience, or good faith, or other equitable standards of conduct is sufficient cause to invoke the doctrine. *Kendall-Jackson Winery Ltd., supra,* at 979; *DeRosa v. Transamerica Title Ins. Co.*, 213 Cal.App.3d 1390, 1395-1396 (1989).

In order to apply the doctrine of unclean hands, Defendants need only establish that Hannibal's unclean hands relate to "the transaction before the court or which affects the equitable relations between the litigants in the matter before the court . . . ." *Kendall-Jackson Winery, Ltd., supra,* at 985.

In this case, Hannibal engaged in numerous acts that give rise to an unclean hands defense. Hannibal encouraged SP to submit falsified bank records to John Travolta's representatives to misrepresent that SP had funds sufficient to meet Mr. Travolta's salary demand. Hannibal also indicated that it would use these same documents to represent to outside investors that SP had the necessary funds to back Chasing the Dragon, a motion picture that SP had decided not to pursue. Hannibal even went so far as to tell certain outside investors that SP had agreed to finance and produce Chasing the Dragon, despite the fact that SP had never entered into any

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

agreement with respect to Chasing the Dragon.  This conduct illustrates Hannibal's unclean hands and bars recovery on Hannibal's complaint.

### D.   Hannibal's Damages Are Improper.

Hannibal's lost profits analysis is based entirely on the improper speculation regarding how the Fast Flash movie would have performed, as set forth by Hannibal's expert, Lawrence Mortorff.  Because Mr. Mortorff's testimony with respect to these speculative damages is improper, and Defendants will seek to exclude that testimony by motion in limine, Hannibal's damages are greatly reduced.

All other damages sought by Hannibal are based on the allegations of fraudulent or negligent misrepresentations by Defendants.   Because no such misrepresentations were made by Defendants, Hannibal is not entitled to recover any damages.

## III.   BIFURCATION OF ISSUES

Defendants do not seek bifurcation of any issues.

## IV.   JURY TRIAL

Plaintiffs have requested a jury trial.  Defendants estimate that the trial will last 3-5 court days.

## V.   ABANDONMENT OF ISSUES

Cross-Complainant Sonja Productions, Inc. no longer intends to pursue its cross-complaint against Hannibal Pictures, Inc.

DATED: May 1, 2009                    BROWNE WOODS GEORGE LLP

By _____
   Gene Williams

Attorneys for Defendants
Sonja Productions LLC,
Sonja Tremont-Morgan, and Counter-Claimant
Sonja Productions LLC

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

# PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 2121 Avenue of the Stars, 24th Floor, Los Angeles, California 90067.

On May 1, 2009, I served the foregoing document described as: **DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW** on the parties in this action by serving:

***Counsel for Hannibal Pictures, Inc.***
A. Raymond Hamrick, III
David L. Evans
Ian Culver, Esq.
Martin J. Barab, Esq.
HAMRICK & EVANS, LLP
111 Universal Hollywood Drive
Suite 2200
Universal City, California 91608
Tel: (818)763.5292
Fax:(818) 763.2308

**(X)**    By Envelope - by placing ( ) the original **(X)** a true copy thereof enclosed in sealed envelopes addressed as above and delivering such envelopes:

**(X)    By Mail: As follows:** I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Beverly Hills, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

**( )    By Personal Service:** I delivered such envelope by hand to the offices of the addressee(s).

**(X)    By E-Mail Electronic Transmission:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the person(s) at the e-mail address(es) so indicated on _____ at _____.m. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was incomplete or unsuccessful.

Executed on May 1, 2009, at Los Angeles, California.

**(X)    FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

G. Diane Torosyan

228233_1.DOC

**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**