1
2
3
4

**BROWNE WOODS GEORGE LLP**
Eric M. George (No. 166403)
2121 Avenue of the Stars, 24th Floor
Los Angeles, CA  90067
Telephone:  310.274.7100
Facsimile:  310.275.5697
Email:  egeorge@bwgfirm.com

5
6
7
8

**CLIFFORD CHANCE US LLP**
Juan P. Morillo (*Pro Hac Vice*)
2001 K Street, N.W.
Washington, DC 20006
Telephone  202-912-5000
Facsimile:  202-912-6000
Email:  Juan.Morillo@CliffordChance.com

9
10

**Attorneys for Defendant**
**SONJA TREMONT-MORGAN**

11

**UNITED STATES DISTRICT COURT**

12

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

13
14
15
16
17
18
19
20
21
22
23
24
25

HANNIBAL PICTURES, INC.,
a California corporation,

                          Plaintiff,

            vs.

SONJA PRODUCTIONS LLC,
a Delaware limited liability company;
SONJA TREMONT-MORGAN,
an individual; and
DOES 1 through 10, inclusive,

                          Defendant.



AND RELATED CROSS-ACTION

Case No. 06-CV-1814 GHK
(VBKx)
Assigned for all Purposes to Judge
William D. Keller

[Removed from the Superior Court
for the County of Los Angeles,
Case No. BC348012]

**DEFENDANT SONJA
MORGAN'S MOTION
FOR A NEW TRIAL OR
REMITTITUR UNDER
FED. R. CIV. P. 59(A)**

Date:        September 18, 2009

26
27
28

1
2

# TABLE OF CONTENTS

3  TABLE OF CONTENTS.............................................................................i

4  TABLE OF AUTHORITIES .....................................................................ii

5  INTRODUCTION ..................................................................................... 1

6  LEGAL STANDARD FOR  GRANTING MOTION FOR A NEW TRIAL OR

7      REMITTITUR. ................................................................................... 3

8  ARGUMENT .............................................................................................. 4

9  I.     HANNIBAL PICTURES FAILED TO INTRODUCE EVIDENCE

10          THAT IT IS ENTITLED TO MORE THAN A FRACTION OF THE

11          COMPENSATORY DAMAGES AWARDED BY THE JURY. ...................... 4

12     A.     The Trial Evidence Does Not Provide A Basis To Conclude That The

13          Film Would Have Been Completed Or Generated Revenue. ....................... 6

14     B.     No Sufficient Evidence Established That An Unmade Film Would

15          Have Generated $40 Million. .......................................................... 9

16  II.    AT MOST, THE TRIAL EVIDENCE SUPPORTS A DAMAGES

17          AWARD OF $212,094. ..................................................................... 12

18  III.   THIS COURT SHOULD ELIMINATE THE PUNITIVE DAMAGES

19          AWARD AGAINST MS. MORGAN. ................................................... 14

20  CONCLUSION ......................................................................................... 17

21
22
23
24
25
26
27
28

1

2

# TABLE OF AUTHORITIES

3

## FEDERAL CASES

4

5
*Fenner v. Dependable Trucking Co., Inc.*,

6
716 F.2d 598 (9th Cir. 1983) ..........................................................................4

7
*Gasperini v. Center for Humanities*,

8
518 U.S. 415 (1996) .......................................................................................3

9
*Molski v. M.J. Cable, Inc.*,

10
481 F.3d 724 (9th Cir. 2007) ..........................................................................3

11
*Montgomery Ward & Co. v. Duncan*,

12
311 U.S. 243 (1940) .......................................................................................3

13
*Nutri-Metics Int'l., Inc. v. Carrington Labs., Inc.*,

14
1992 WL 389246 (9th Cir. 1992).................................................................16

15
*Prendeville v. Singer*,

16
155 Fed. Appx. 303 (9th Cir. 2005) ...............................................................4

17
Provident Life & Acc. Inc. Co.,

18
32 Fed. Appx. 821 (9th Cir 2002) ................................................................16

19
*State Farm Mut. Auto. Ins. Co. v. Campbell*,

20
538 U.S. 408 (2003) ...............................................................................16, 17

21
*White v. Ford Motor Co.*,

22
312 F.3d 998 (9th Cir. 2002) ........................................................................15

23

## STATE CASES

24

25
*Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*,

26
96 Cal. App. 4th 1017 (2d Dist. 2002) .........................................................15

27
*Boeken v. Philip Morris Inc.*,

28
127 Cal. App. 4th 1640 (2d Dist. 2005) ..................................................4, 15

**MOTION FOR A NEW TRIAL OR REMITTITUR**

*Brown  v. Boehm*,

    178 P.2d 49 (3d Dist. 1947)......................................................................3

*Grupe v. Glick*,

    26 Cal. 2d 680 (1945) .....................................................................6, 7

*Kids Universe v. In2Labs*,

    95 Cal. App. 4th 870 (2d Dist. 2002) .........................................6, 7, 8, 10, 11

*Neal v. Farmers Ins. Exch.*,

    582 P.2d 980 (Cal. 1978).................................................................15

*Parlour Enterprise, Inc. v. The Kirin Group, Inc.*,

    152 Cal. App. 4th 281 (4th Dist. 2007) ......................................7, 8, 9, 10, 11


**FEDERAL STATUTES**

Fed. R. Civ. P. 59(a)(1)(A) .........................................................................3

-iii-

Defendant Sonja Tremont-Morgan ("Ms. Morgan") respectfully submits this Memorandum of Points and Authorities in support of her Motion for a New Trial or Remittitur pursuant to Rule 59(a) of the Federal Rules of Civil Procedure.  Ms. Morgan respectfully asks this Court to grant a new trial or, in the alternative, to conditionally deny Ms. Morgan's motion upon the acceptance by Hannibal Pictures, Inc. ("Hannibal Pictures") of a reduced damages award in the amount of $212,094. This Court should do so for two reasons.  <u>First</u>, the balance of the jury's compensatory damage award of more than $6.8 million is based impermissibly upon speculative calculations about Hannibal Pictures' lost profits.  Hannibal Pictures alleges it had a finance deal for a month, but that the deal then fell threw.  Hannibal Pictures' theory of harm, however, is wholly speculative:  even though Hannibal Pictures could not convince anyone else in the world to invest in the project, Hannibal Pictures' expert speculates that the film (which has never been made) would have been ultra-successful and grossed $40 million.  That theory is simply impermissibly speculative. <u>Second</u>, the punitive damages award likewise is unsupported by the evidence adduced at trial.

## INTRODUCTION

Ms. Morgan is the founder and owner of a film production company, Sonja Productions, LLC ("SP LLC").  In January 2006, SP LLC entered into a contract with Plaintiff Hannibal Pictures, Inc. ("Hannibal Pictures") to produce and finance a film, *Fast Flash to Bang Time* ("*Fast Flash*").  Less than a month later, however, that deal fell apart.  And less than a month later, Hannibal Pictures brought this action against both Ms. Morgan and her LLC, alleging the following four causes of action: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) negligent misrepresentation; and (4) fraud.

Hannibal Pictures sought relief from Ms. Morgan in her personal capacity for fraud and negligent misrepresentation, alleging that Ms. Morgan personally made

1

misrepresentations about SP LLC's ability to meet its contract obligations to Hannibal Pictures. Moreover, Hannibal Pictures sought to hold Ms. Morgan liable personally for SP LLC's alleged breach of contract and breach of the implied covenant of good faith and fair dealing on the theory that SP LLC was Ms. Morgan's alter ego.

On June 19, 2009 the jury returned a verdict against both Ms. Morgan and SP LLC on all four counts. The jury assessed Hannibal Pictures' damages at $6,816,294 for each of the four causes of action. The same day, the jury also awarded punitive damages against Ms. Morgan in the amount of $250,000.

In its Order entered September 3, 2009, this Court declined to follow the jury's advisory verdict on alter ego liability, and concluded that "Sonja Productions, LLC is not the alter ego of Sonja Tremont-Morgan." (In-Chambers) Findings and Conclusions by the Court Pursuant to Fed. R. Civ. P. 52(a)(1), Docket No. 193 at 3 (Sept. 3, 2009). As a result, Ms. Morgan could not be liable for Hannibal Pictures' claims for breach of contract and breach of the implied covenant of good faith and fair dealing. *Id.* This Court, however, affirmed the jury's verdict against Ms. Morgan on the two remaining claims for fraud and negligent misrepresentation. Accordingly, this Court entered judgment on September 3, 2009 against Ms. Morgan and SP LLC in the amount of $6,816,294 in compensatory damages, as well as punitive damages against Ms. Morgan in the amount of $250,000. Judgment, Docket No. 194 at 1–2 (Sept. 3, 2009).

This amount of damages is completely unsupported by the evidence adduced at trial. As a result, this Court should exercise its authority under federal and California law to reduce the jury's award of damages to the amount that is supported by the record. Indeed, the vast majority of the compensatory damages award (all but $212,094) is barred under California law because the current award relies impermissibly on speculation about the profits that Hannibal Pictures would have made under the contract. Moreover, Hannibal Pictures is not entitled to any punitive

-2-

damages because that award is against the great weight of the evidence. Accordingly, this Court should grant Ms. Morgan's motion for a new trial. In the alternative, this Court should require Hannibal Pictures to accept either a new trial or a reduced damages award of only $212,094.

## LEGAL STANDARD FOR
## GRANTING MOTION FOR A NEW TRIAL OR REMITTITUR.

Under Rule 59, after a jury trial the "court may, on motion, grant a new trial on all or some of the issues — and to any party — … for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "As [the Ninth] [C]ircuit has noted, Rule 59 does not specify the grounds on which a motion for a new trial may be granted. Rather, the court is bound by those grounds that have been historically recognized." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (internal quotation marks omitted). Such "grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Id.* (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). In evaluating a Rule 59 motion, "the district court has the duty ... to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence." *Molski*, 481 F.3d at 729 (alterations in original) (internal quotation marks omitted).

When a party in a diversity case moves for a new trial on the ground that the damages are excessive, federal courts must apply the state law standard of excessiveness. *See Gasperini v. Center for Humanities*, 518 U.S. 415, 426–31 (1996); 12 Moore's Fed. Prac. 3d § 59.13[2][g][iii][C] (2008) (collecting cases). In deciding whether the jury's award is excessive, California law permits a trial court to reduce a jury verdict where the court "in its independent judgment" does not find that the jury's

award is "fair and reasonable."  Cal. Code Civ. Proc. § 662.5.  California law thus provides trial courts with wide latitude to reduce a damages award: essentially, "The trial judge sits as a thirteenth juror with the power to weigh the evidence and judge the credibility of the witnesses.  If he believes the damages awarded by the jury to be excessive and the question is presented, it becomes his duty to reduce them."  *Brown v. Boehm*, 178 P.2d 49, 50 (3d Dist. 1947); *see also Boeken v. Philip Morris Inc.*, 127 Cal. App. 4th 1640, 1689 (2d Dist. 2005).

After a district court has "determine[d] that the damages award is excessive, it has two alternatives": it may (1) "grant defendant's motion for a new trial"; or (2) "deny the motion conditional upon the prevailing party accepting a remittitur." *Fenner v. Dependable Trucking Co., Inc.*, 716 F.2d 598, 603 (9th Cir. 1983).[1]  In this circuit, "[t]he proper amount of a remittitur is the maximum amount sustainable by the evidence."  *Prendeville v. Singer*, 155 Fed. Appx. 303, 304–05 (9th Cir. 2005).  If the court conditionally denies a Rule 59 motion upon the acceptance of a remittitur, "[t]he prevailing party is given the option of either submitting to a new trial or of accepting a reduced amount of damage which the court considers justified."  *Fenner*, 716 F.2d at 603.  And "[i]f the prevailing party does not consent to the reduced amount, a new trial must be granted.  If the prevailing party accepts the remittitur, judgment must be entered in the lesser amount."  *Id.*

## ARGUMENT

## I.   HANNIBAL PICTURES FAILED TO INTRODUCE EVIDENCE THAT IT IS ENTITLED TO MORE THAN A FRACTION OF THE COMPENSATORY DAMAGES AWARDED BY THE JURY.

The jury's award of $6,816,294 in damages is excessive because only a much smaller amount is supported by the evidence adduced at trial.  Specifically, while

---

[1] "A remittitur is a device which the court may invoke to correct an excessive verdict."  *Fenner*, 716 F.2d at 603 n.3.

-4-

Hannibal Pictures claimed that it suffered damages of approximately $6.9 million as a result of Ms. Morgan's and SP LLC's collective conduct, nearly all of that damages figure is derived solely from speculative assumptions about *Fast Flash's* profitability. Because California law bars recovery for speculative damages, however, this Court must disregard all such evidence in evaluating under Rule 59(a) whether the record supports the jury's damages award. In contrast, this Court may consider only the losses that Hannibal Pictures suffered with reasonable certainty, which were shown here only in the amount of $212,094. Accordingly, the jury's award of more than $6.8 million is not "fair or reasonable" under California law, and it should not withstand this Court's scrutiny in the process of weighing Ms. Morgan's Motion.

Hannibal Pictures relied on the testimony of its expert, Lawrence Mortorff, to introduce evidence of the damages that it claimed to have suffered as a result of SP LLC's alleged breach of contract and Ms. Morgan's alleged misrepresentation. Mr. Mortorff calculated Hannibal Pictures' damages at approximately $6.9 million.

Significantly, the lion's share of these alleged damages are based on the faulty assumption that *Fast Flash* would have generated $40 million in sales worldwide. *See* (TT, Day 7, at 131:10–133:5). These hypothetical sales were the sole basis for Mr. Mortorff's conclusion that plaintiffs suffered three types of damages totaling $5,197,000: (1) lost commissions on foreign sales ($3,000,000), *(*TT Day 7, at 131:21–132:10); (2) lost commissions on domestic sales ($1,000,000), *id.* at 132:21–133:5; (3) lost recoupment of unspent funds from the film's budget ($1,197,000), *id.* at 136:4–23, 138:10–12.[2]

---

[2] The components of Mr. Mortorff's conclusions are discussed in more detail in the following paragraphs. In short, Mr. Mortorff's assessment that Hannibal Pictures suffered $6.9 million in damages rests on the three components set forth above plus: (1) $666,000 from a Florida tax rebate, (TT Day 7, at 134:18–135:7); (2) $800,000 production fee, *id.* at 135:8–24; (3) $52,094 from reimbursements of expenses, *id.* at 131:13; and (4) $200,000 from a marketing costs advance, *id.* at 134:4–12.

**MOTION FOR A NEW TRIAL OR REMITTITUR**

All of these three types of alleged damages stems from the assumption that a completed film would have generated $40 million in sales.  That premise, however, lacks any support for two reasons.  <u>First</u>, no basis in the trial record supports the position that the film ever would have been completed and delivered, or that it would have generated any revenue.  <u>Second</u>, Mr. Mortorff's testimony is based entirely on unreliable data points provided by Hannibal Productions about the film's projected worldwide sales.

**A.  The Trial Evidence Does Not Provide A Basis To Conclude That The Film Would Have Been Completed Or Generated Revenue.**

Mr. Mortorff's assumptions about lost profits are fundamentally flawed particularly because the financing deal fell apart at the very early stages of the prospective venture.  Under such circumstances, it is nearly impossible to determine how long the project would have survived if the parties had proceeded beyond early February 2006.  In fact, the trial evidence indicates that independent films like *Fast Flash* are inherently risky, and it establishes that a myriad of contingencies and uncertainties could have derailed *Fast Flash* before the film generated any revenue.

Indeed, California courts generally distinguish between established and unestablished businesses.  With respect to an established venture, lost profits "are generally recoverable for the reason that their occurrence and extent may be ascertained with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales."  *Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870, 883 (2d Dist. 2002) (quoting *Grupe v. Glick*, 26 Cal.2d 680, 692–94 (1945)).  "On the other hand, lost anticipated profits for an <u>unestablished business</u> whose operation is prevented or interrupted are generally not recoverable because their occurrence is uncertain, contingent and speculative."  *Kids' Universe*, 95 Cal. App. 4th at 883 (emphasis in original) (quoting *Grupe*, 25 Cal.2d at 692–93).  "Nevertheless, they may be recovered where the evidence makes reasonably certain

-6-

their occurrence and extent." *Parlour Enter., Inc. v. The Kirin Group, Inc.*, 152 Cal. App. 4th 281, 288 (4th Dist. 2007). "Certainty as to the amount is not required; reasonable certainty is sufficient." *Id.* Under California law, "[t]hese principles apply to both tort and contract cases." *Id.*

Thus, Hannibal Pictures was required to introduce evidence that makes "reasonably certain [the] occurrence and extent" of the losses that it suffered from this "unestablished" venture. *Id.* But because "the whole scenario [with respect to such losses] presented by plaintiffs is rife with speculation" about what would have occurred if the film had been completed and delivered, Hannibal Pictures has failed to establish that it is entitled to recover nearly all of the damages it seeks. *Kids' Universe*, 95 Cal. App. 4th at 887. The trial evidence establishes that risks beyond the parties' control threatened the project's viability and innumerable contingencies would have had to occur before the film generated any revenue.

The venture here fell apart less than a month after the parties signed the contract to finance and produce the film. At that time, the film faced a number of substantial risks to its viability. Among other things, the parties had no firm agreements with either John Travolta, the film's proposed star (whose requested $6 million was not in escrow), or Rosario Dawson, the film's proposed co-star. *See* (TT Day 3, 20:25–21:9). In addition, the film's proposed director was a novice with no prior experience in directing films. *See* (TT Day 3, 84:1–2). A number of other factors indicate the riskiness of this venture, including the lack of a U.S. distribution deal in place, *see* (TT Day 3, 11:15–18), and the difficulty the parties experienced in obtaining a bond for the film. Indeed, such factors are typical in the finance and production of independent films. As Hannibal Pictures' own expert noted, independent films are inherently risky business ventures. *See* (TT Day 7, 125:14:24).[3] This level of risk is

---

[3] Courts similarly have noted the risks involved in independent filmmaking. *See, e.g.*, *Goldberg v. Paris Hilton Entertainment, Inc.*,  08-22261-CIV-MORENO, Order Precluding Reliance Damages at 2 (Aug. 17, 2009) (rejecting damages for breach of

-7-

illustrated further by Mr. Travolta's demand for a pay-or-play arrangement.  *See, e.g.*, (TT Day 7, 69:1–16).  Under this arrangement, Mr. Travolta would be compensated regardless of whether the film was actually made, which is strong evidence of the risk that this project would not be completed.  *See* (TT Day 120:15–25).

In addition, the film's viability (and potential profitability) would have been conditioned upon innumerable contingencies, the occurrence of which was anything but certain.   Indeed, Hannibal Pictures' own expert testified about many of the contingencies upon which a film's successful production is conditioned.  Mr. Mortorff testified, for example, that:

> usually … you spend six to 12 months, at a minimum, getting the movie
> to the point where you start photography and making presales, and
> getting the script ready, budgeting, finding locations.  And then once you
> find equity money and you got your presales in place and you go to a
> bank and a bond company, you set the timeline.  You set the cash flow
> for moving forward the movie to where you know your start date is X.
> And you can meet that start date based upon a preproduction schedule of
> a certain number of weeks, a post-production schedule of a certain
> number [of] weeks or months, and then when you finish the picture, you
> deliver it to whoever has purchased it.

(TT Day 7, at 108:20–109:10).  And at each step of the production process that Mr. Mortorff described in his testimony, there contingencies that potentially could affect the film's continuing viability.  Whether the producers are able to make presales, for example, are simply one of many factors that can contribute to the film's viability and/or the film's investor's ability to recover their investments.   Moreover, the occurrence of conditions such as sales agreements are even more uncertain in the film's early stages.  *See, e.g.*, *Parlour*, 152 Cal. App. 4th at 253 ("Perhaps the parties could have come to an agreement, … but at the time [an unestablished venture fell

---

contract as speculative in part because "[o]ne never knows how much a movie may make, and in fact most independent films not tied to the well-known studios fail to make money").

**MOTION FOR A NEW TRIAL OR REMITTITUR**

through] it was speculative whether [plaintiffs] would have been able to secure signed [contracts]").  For these reasons, it is clear that the evidence adduced at trial does not support to a reasonable certainty the possibility that *Fast Flash* would even have been completed, not to mention generate profits.

### B.  No Sufficient Evidence Established That An Unmade Film Would Have Generated $40 Million.

Although Plaintiff's financing for the Film fell through, Plaintiff lost at most a month's time.  Following the failure of the deal, Plaintiff could not convince a single investor in the world to invest in the project.  Nonetheless, Hannibal Pictures' expert, Mr. Mortorff, testified that—in his "conservative" estimation—*Fast Flash* would have generated $40,000,000 in sales worldwide.  *See* (TT, Day 7, at 131:10–133:5). Beyond Mr. Mortorff's faulty assumptions that the parties would have completed and delivered *Fast Flash*, and that the film would have generated revenue, the methodology he used to derive the sales projections is fatally flawed.

To reach his conclusions about the amount of sales that the film would have generated, Mr. Mortorff relied exclusively on "*the Hannibal projections* of ask and take prices for the picture." *Id.* at 131:21–25 (emphasis added).  Mr. Mortorff testified that he "compared … the actual sales made by Hannibal territory by territory and compared them with the take and the ask price." *Id.* at 132:2–5.  Because the trial evidence reflects that there were only $6.7 million in foreign presales—and because there was no U.S. distribution deal in place—Mr. Mortorff could have extrapolated his conclusions only from those foreign presales that Hannibal Pictures had arranged by January 2006.  *See, e.g.*, (TT Day 3, 11:15–17, 13:25–14:5).  From the fact that Hannibal Pictures "in general" had received "about the take price, if not better" in these few foreign sales (TT Day 7, 132:5–7), Mr. Mortorff opined that the film would have generated roughly $15 million in total foreign sales, and approximately $25 million in domestic sales.  (TT Day 7, 132:1–7, 133:2–5).

-9-

**MOTION FOR A NEW TRIAL OR REMITTITUR**

California courts have identified a number of ways that a plaintiff may prove damages for lost profits in cases involving "unestablished" ventures like the film in this case. Specifically, "[i]f the business is a new one or if it is a speculative one … damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like." *Parlour*, 152 Cal. App. 4th at 288 (alterations in original) (quoting *Kids' Universe*, 95 Cal. App. 4th at 884). "Also relevant is whether the market is an established one," as well as "the experience of similar businesses." *Kids' Universe*, 95 Cal. App. 4th at 885. "The underlying requirement for each of these types of evidence is a <u>substantial similarity between the facts</u> forming the basis of the profit projections and the business opportunity that was destroyed." *Parlour*, 152 Cal. App. 4th at 288 (emphasis added).

Under this framework, Mr. Mortorff's methodology is insufficient for three reasons to project with sufficient certainty the amount of lost profits.

<u>First</u>, there is no evidence that the sample of sales from which Mr. Mortorff derived the lost sales projections is representative of the film's prospective, unconsummated sales. Indeed, the record provides no details from which a trier of fact could conclude that Mr. Mortorff's "projections [were] based on <u>facts</u> that are substantially similar to the lost business opportunity." *Parlour*, 152 Cal. App. 4th at 290. By contrast, there are plenty of reasons to believe that the few foreign sales that had occurred before February 2006 were unrepresentative. For example, Mr. Mortorff assumed that the parties would obtain <u>domestic</u> sales at Hannibal Pictures' projected take price based only on the fact that some other <u>foreign</u> sales agreements had been reached at or around the take price. And among other things, the parties never obtained a domestic sales agreement. *See* (TT, Day 3, 11:15–18). And because Hannibal Pictures did not otherwise meet its burden of showing that the completed foreign sales agreements were representative of any others, Mr. Mortorff's projections

**MOTION FOR A NEW TRIAL OR REMITTITUR**

are impermissibly speculative.  *See Parlour*, 152 Cal. App. 4th at 290; *Kids' Universe*, 95 Cal. App. 4th at (rejecting expert testimony regarding lost profits as too speculative where expert's comparison to sample pool went "unexplained" and "without any analysis" as to why the same was representative).

Second, it is unclear which sales (and how many total sales) Mr. Mortorff assumed would have been made.  Hannibal Pictures introduced no evidence to explain which sales comprised the pool of projected sales and, of particular importance, whether Mr. Mortorff assumed that the parties would reach sales agreements with all of their targeted markets.  Among other reasons, this is important in light of Mr. Mortorff's own testimony, which is that "you never get 100 percent presales."  (TT Day 7, 20–24. Mr. Mortorff's testimony thus could rely upon exactly the kind of "speculation and hypothetical situations" of which California courts have disapproved where (as here) a party attempts to use "[e]xpert testimony alone [as] a sufficient basis for an award of lost profits in the new business context."  *Kids' Universe*, 95 Cal. App. 4th at 885.

Third, rather than relying on independent data, Mr. Mortorff relied exclusively on Hannibal Pictures' data in arriving at a projected sales figure of $40,000,000.  *See* (TT, Day 7, at 131:21–25).  As in *Parlour*, "[t]he record does not reveal the method used to calculate the projections"—here, the ask and take prices).  152 Cal. App. 4th at 290.  Similarly, "[d]espite their extensive experience, [the projection's creators did not] testify as to any particular qualifications that would allow them to predict" the ask and take prices on which Mr. Mortorff relied.  *Id*.  "Nor did anyone testify as to the facts underlying the projections or the calculations used to prepare them."  *Id.* at 291.  Accordingly, for the same reasons as in *Parlour*, Mr. Mortorff's reliance upon Hannibal Pictures' projections renders his testimony impermissibly speculative.  *Id.*

For each of these reasons, the testimony of Mr. Mortorff does not establish with sufficient certainty the amounts that Hannibal Pictures would have made from either

-11-

the domestic and foreign sales commissions or the recoupment of profits from the budget. Instead, the $5,197,000 damages estimate is the result or speculation and evidence lacking any foundation. As a result, that amount is too speculative under California law.

## II.    AT MOST, THE TRIAL EVIDENCE SUPPORTS A DAMAGES AWARD OF $212,094.

In addition to the three types of damages discussed above that stemmed from lost profits, Mr. Mortorff concluded that Hannibal Pictures was entitled to damages for four additional categories of loss, which total $1,718,760: (1) lost rebate from the state of Florida ($666,000), *id.* at 134:18–135:7; (2) lost production fee ($800,000), *id.* at 135:8–24; (3) lost reimbursement of Hannibal Pictures' pre-contract outlays for its "efforts and assistance in development and production of the" film ($52,094), TE 115 ¶ 4; (TT Day 7, 131:13); and (4) a lost marketing and promotion advance ($200,000), (TT Day 7, 134:4–12). With the exception of the $52,094 in reimbursements $160,000 (of the claimed $800,000) in production fees, the trial evidence does not support the award of these damages.

The evidence does not support the conclusion that Hannibal Pictures lost a $666,000 in the form of a Florida rebate. Specifically, the rebate is too speculative because it is contingent not only upon the film's completion and delivery, but also the state of Florida's satisfaction that the film was produced in Florida according to various state law requirements. As Mr. Mortorff testified, payment of this rebate was conditioned (among other things) upon the film's qualification "as a Florida production," as well as the film's being "shot there with local crews, spending local money," and completing "the proper applications … and giv[ing] your accounting to the state." *Id.* at 134:14–135:7. Because Hannibal Pictures thus failed to show at trial that it was reasonably certain that it would have ever obtained the Florida rebate, it cannot recover for such a speculative loss.

-12-

Similarly, with respect to the production fee, Ms. Morgan does not dispute in this motion that the trial evidence indicates that Hannibal Pictures lost <u>a portion</u> of the $800,000 fee. The record establishes that Hannibal Pictures would have been entitled to a fee of at most $160,000. Hannibal Pictures' total production fee under the contract was set at $800,000, subject to two conditions precedent: the fee was payable "[t]wenty-percent (20%) upon signature of John Travolta's deal memo and balance upon the first day of principal photography." TE 115 at ¶ 6. When the deal between SP LLC and Hannibal Pictures fell apart, however, the evidence supports with reasonable certainty only that Mr. Travolta's deal memo had been signed, which would have triggered a payment of $160,000 to Hannibal Pictures. The issue of whether the venture would have survived until the "first day of principal photography," however, is too speculative to permit recovery of the balance of the production fee. Indeed, the very fact that the contract imposed a deferral of 80% of the production fees until the film started shooting is highly probative of the fact that, at the time of contract, the parties anticipated that the venture might not survive even after John Travolta agreed to star in the film. *See* TE 115 at ¶ 6. Moreover, awarding Hannibal Pictures the unearned portion of the production fee would result in an unjustified windfall to Hannibal Pictures at the expense of SP LLC and Ms. Morgan.

Ms. Morgan does not dispute in this motion that the trial evidence shows with reasonable certainty that Hannibal Pictures lost $52,094 in outlays that it incurred before SP LLC and Hannibal Pictures entered into the contract to finance and co-produce the film. *See, e.g.*, TE 115 ¶ 4.

Lastly, with respect to the $200,000 advance for marketing expenses, no evidence in the record supports the conclusion that Hannibal Pictures was entitled to this retain this amount for itself. In fact, the contract assigned Hannibal Pictures the role of "International Sales Agent" and "will be *advanced* a marketing and promotion *expense* of USD $200,000 payable through the budget." TE 115 ¶ 5. This provision

-13-

_____
**MOTION FOR A NEW TRIAL OR REMITTITUR**

thus clearly contemplates an understanding between SP LLC and Hannibal Pictures that the $200,000 advance was intended to be used for marketing and advertising outlays, and not to be retained by Hannibal Pictures as profits.  Accordingly, nothing in the record supports the inference that Hannibal Pictures would have retained any portion of this marketing advance as profits but for the alleged conduct of SP LLC and/or Ms. Morgan.  As a result, this advance is not recoverable because it is not "reasonably certain" that this loss occurred.  *Parlour*, 152 Cal. App. 4th at 288.

For these reasons, it is apparent that the trial record establishes to a reasonable certainty only that Hannibal Pictures suffered a total loss of $212,094.  In contrast, Hannibal Pictures is not entitled to recover any of the damages it seeks for its alleged losses of the Florida rebate and the advance for marketing expenses because their "occurrence[s]"—like those of its allegedly lost sales commissions and lost profits—"[are] uncertain, contingent and speculative." *Kids' Universe*, 95 Cal. App. 4th at 883.

## III.   THIS COURT SHOULD ELIMINATE THE PUNITIVE DAMAGES AWARD AGAINST MS. MORGAN.

The jury's decision to award $250,000 in punitive damages against Ms. Morgan should not stand because it is grossly disproportionate to the conduct for which the jury found her liable.  As this Court observed in its Order entered September 3, 2009, the sum total of the trial evidence that established Ms. Morgan's liability for fraud comprised just a single act; specifically, that:

> Mrs. Morgan personally reviewed and approved the language on Sonja Productions, LLC's website, which stated: "Sonja Productions established August 2005, has cash funding to invest in 2006/2007 in 5 motion pictures in the range of USD $25,000,000 to $50,000,000 for each film."

(In-Chambers) Findings and Conclusions by the Court Pursuant to Fed. R. Civ. P. 52(a)(1), Docket No. 193 at 4 (Sept. 3, 2009).  The jury's decision to assess $250,000 in punitive damages against Ms. Morgan is not reasonably related to this single action,

-14-

especially because such an action is not the sort of egregious and reprehensible misconduct that punitive damages are designed to punish and deter. *See, e.g.*, *Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*, 96 Cal. App. 4th 1017, 1051 (2d Dist. 2002) ("Punitive damages are proper only when the tortious conduct rises to levels of extreme indifference to the plaintiff's rights, a level which decent citizens should not have to tolerate.")  And as California's Supreme Court has observed, "the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter." *Neal v. Farmers Ins. Exch*., 582 P.2d 980, 990 (Cal. 1978).  Accordingly, this Court should eliminate the jury's award of punitive damages against Ms. Morgan.

As with a review of the excessiveness of compensatory damages under Rule 59(a), this Court's "role … is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." *White v. Ford Motor Co*., 312 F.3d 998, 1026 (9th Cir. 2002) (internal quotation marks omitted).   Thus, "[i]n California, a trial court reviews a motion challenging the excessiveness of an award of punitive damages similar to other motions for new trial, as a 'thirteenth juror': 'The trial court is in a far better position than an appellate court to determine whether a damage award was influenced by 'passion or prejudice.'" *Boeken v. Philip Morris Inc*., 127 Cal. App. 4th 1640, 1689 (2d Dist. 2005).  More specifically,

> [A] California court may set aside a punitive damage award only where the award appears excessive, or ... is so grossly disproportionate as to raise the presumption that it is the result of passion or prejudice. Whether the award raises the presumption of passion and prejudice is measured by the same three factors that the jury uses to determine the amount of the award initially: reprehensibility of defendant's misdeeds, the ratio between the compensatory and punitive damages, and the ratio between the damages and the defendant's net worth.

-15-

*Provident Life & Acc. Inc. Co*., 32 Fed. Appx. 821, 826 (9th Cir 2002) (internal quotation marks omitted).   California law thus requires "a reasonable relationship between … the award's size" and the three punitive damages factors.   *Nutri-Metics Int'l., Inc. v. Carrington Labs., Inc*., 1992 WL 389246, 12 (9th Cir. 1992).

Of these factors, the U.S. Supreme Court has emphasized that "[t]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."   *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).   Courts "determine the reprehensibility of a defendant by considering," among other factors, whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.*   "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.*   Moreover, "[i]t should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence."   *Id.*

Applying these principles, this Court cannot allow the jury's assessment of punitive damages to stand.   Ms. Morgan's purported approval of the language on SP LLC's website is not so reprehensible as to warrant an award aimed at either punishment or deterrence.   Under the U.S. Supreme Court's *Campbell* rubric, there is no evidence to support a claim that Ms. Morgan's action caused physical harm, "evinced an indifference to or a reckless disregard for" others' health or safety, affected a financially vulnerable target, engaged in such actions more than once, or

caused harm through "intentional … deceit." *Campbell*, 538 U.S. at 419. Accordingly, this Court should conclude that the jury's award of punitive damages is excessive and not reasonably related to the conduct at issue. From this conclusion, this Court should grant Ms. Morgan's Motion for a New Trial. In the alternative, this Court should assert its authority under Rule 59 and California law to require Hannibal Pictures to choose between a new trial and a the reduction of punitive damages to zero (in addition to the reduction in compensatory damages discussed above).

## CONCLUSION

For the foregoing reasons, Ms. Morgan respectfully requests that this Court grant her motion for a new trial or remittitur.

Dated: September 18, 2009

By:    /s Eric M. George

BROWNE WOODS GEORGE LLP
Eric M. George (No. 166403)
2121 Avenue of the Stars, 24th Floor
Los Angeles, CA  90067
Telephone:  310.274.7100
Facsimile:  310.275.5697
Email:  egeorge@bwgfirm.com

-17-